**SCAVONE v. ACHESON, Secretary of State, et al.**

United States District Court
S. D. New York.

Feb. 21, 1952.

Charles Graff, New York City, for plaintiff.

Myles J. Lane, U. S. Atty., Samuel S. Burman, Asst. U. S. Atty., New York City, for defendants.

IRVING R. KAUFMAN, District Judge.

The plaintiff brings this action to declare that she is and has been since her birth a citizen or national of the United States. There are other prayers for relief in the complaint but by pre-trial order they have been abandoned, and a declaratory judgment is sought only with respect to prayer No. 1. Therefore I need not concern myself with the other prayers for relief.

The issue in this case, and there is only really one issue in the case, is whether the plaintiff voted under duress in a local Italian election on March 31, 1946. If she did, then she has not deprived herself of her American citizenship. If she did not, then she has expatriated herself as an American citizen under 8 U.S.C.A. § 801(e). Section 801 reads as follows: "A person who is a national of the United States, whether by birth or naturalization, shall lose his nationality by * * *."

There follow several subdivisions, and subdivision (e) reads: "Voting in a political election in a foreign state or participating in an election or plebiscite to determine the sovereignty over foreign territory".

It would appear therefore that if the plaintiff voted in the election of March 31, 1946, under no duress, she has lost her nationality as a United States citizen, nationality which she had originally acquired through naturalization of her father.

The plaintiff was born on June 3, 1923, in the town of Guardia Lombardia in the Province of Avellino, Italy. Her father had become an American citizen by naturalization prior to her birth. The plaintiff lived continuously in this small town until her trip to the United States in connection with the instant proceedings. She had very little schooling and had worked on a farm which was situated approximately two hours' walking time, from the town itself. Her whole life, until recently, was spent in this tiny rural area.

On March 31, 1946, Guardia Lombardia held a mayoralty election. In connection with this election plaintiff testified that a friend of the family, one Nicola di Biase, was running for mayor; that he had been a boy on a neighboring farm; that all the farm people knew him and wanted to see him elected; indeed, that she wanted to see him elected.

She also testified that she was coerced into voting in this election for police had visited her home three or four times before the March election, and, she said, they told her that it was obligatory that she vote, for if she did not vote, there would be a jail sentence and a fine. She also said that members of the political party came to see her and urged that she cast a ballot.

We are therefore faced with a situation where although the plaintiff says quite frankly that she had a deep interest in the election of di Biase, who was her friend, the friend of her family and the friend of the farmers, nevertheless she also avers that she nonetheless was coerced and pressured into voting in the March election.

The plaintiff, however, admits that she did not vote in any subsequent election; that, indeed, she did not vote in the election of June 2, 1946, which has been recognized by Congress as an important and quite coercive election in Italy. This election was one for members to the Constitutional Assembly. It was a plebiscite offering to Italians the choice between a republican and a monarchial form of government, and the pressure exerted upon the electorate was both legally and morally intense. 1951 U.S. C.C. and A.S. 1690.

The 82nd Congress enacted Public Law 114 effective August 16, 1951, 8 U.S.C.A. § 723, in which persons who lost their United States citizenship by reason of voting in the Italian elections of June 2, 1946 or April 18, 1948, were permitted to regain their citizenship after taking an oath that they did nothing to promote the cause of Communism or performed no other act of expatriation.

This was a direct recognition by Congress that, indeed, there had been great pressure brought on American citizens who had lived in Italy for a good many years to vote in the elections of June 2, 1946, and April 18, 1948. This is significant in this case, because the plaintiff admitted that she did not vote in the June 2, 1946 election, which to my mind indicates that she at all times was undoubtedly free from coercion, or at least in her own mind felt that she could resist any possible coercion. If, as the United States Congress recognized, there was duress in connection with the June 2, 1946 election and there was coercion upon the people residing in Italy, she nevertheless experienced no such coercion in fact and she so testified.

Public Law 114 further indicates by omission that at least the United States Congress did not recognize officially that there was coercion and duress with respect to any other Italian election. I do of course realize that this nevertheless remains an issue for the Court to decide, and that I have the right to decide, if I find it factually sound, that there might nevertheless have been coercion with respect to some other Italian election.

I repeat, however, that the background and enactment of Public Law 114 do indicate to my mind the significance of plaintiff's act for in spite of the official recognition by our Congress that there was coercion and duress with respect to an election held approximately two months after the March 1946 election, the plaintiff nevertheless did not experience any such coercion and in fact did not vote. If the intense legal and moral pressures of the two national elections did not force her to the polls, it is extremely unlikely that when

she did vote in the local election she voted under duress.

This proposition and the evidence persuade me to arrive at the conclusion that the plaintiff was motivated in her voting in March 1946 by the sole desire of seeing her good friend, and the good friend of her family and the farmers, Nicola di Biase, elected mayor.

I am fortified in my conclusion by several inconsistent statements that have appeared during the course of this trial. More particularly, I am persuaded by the affidavit which the plaintiff gave to the American Vice-Consul at Naples, Italy, on February 16, 1950, wherein she stated: "In fact, as soon as I knew that by voting I might compromise my American citizenship, I abstain from voting in the following elections of June 2, 1946 and April 18, 1948."

This is an indication that there could not have been any coercion, undue persuasion or duress exercised upon the plaintiff, because if she voluntarily elected to abstain from the voting, she could not have been terribly concerned about any dire consequences which she says she believed might follow her abstention from voting in March of 1946.

I am mindful also of her testimony that she would not have voted in March of 1946 had she know that she would have lost her American citizenship by such vote—an indication of freedom of will.

She stated further in the affidavit of February 1950, Defendants' Exhibit A: "If I had known before that my participation in the elections would impair my citizenship status, I would certainly do everything I could to avoid it. To be honest, I must say that no one personally forced me to vote, but, I repeat, I did vote because I thought that it was my duty to vote because of the propaganda they were making around."

She stated in one place in the affidavit that she voted only because she thought it was "obligatory to vote" but the following statements appear in the same affidavit: "I only heard around by some people that there were imprisonment and fines for those who would not vote, but, if asked to indicate any person specifically who told me that, I could not indicate anyone."

Further: "that I am not able to submit any affidavit of notarial act by anyone who could testify that I voted as a result of fear and duress, because this would not be truth and because if I knew regulations I would not vote. In fact I have been free to abstain from voting in the other elections without being bothered by anyone for the reason that I did not vote."

And further: "that I have no basis to state that the Government of the United States acted against the law in depriving me of my American citizenship, but I only hoped to be forgiven for my act because of my ignorance of regulations and because of my strong desire to be with my whole family in the United States."

■ The courts have held that ignorance on the part of the person seeking declaration of American citizenship, of the fact that an act or acts on the part of that person would deprive him of American citizenship, is not a bar to such deprivation. Indeed, they have held that intention to be expatriated is not a necessary element.

Recently the Court of Appeals for this circuit dealt with this principle of law in Revedin v. Acheson, 2 Cir., 194 F.2d 482, and Judge Clark, writing for the Court, stated: "But the requirement of a legally valid oath for purposes of gaining citizenship is not to be imported into the statutory provisions dealing with its loss. The statutory provision itself is not so qualified * * *."

Further: "Nor can there longer be doubt that an intent to renounce American citizenship is not a prerequisite for expatriation. Savorgnan v. United States (338 U.S. 491, 70 S.Ct. 292, 94 L.Ed. 287) * * * is quite explicit as to this * * *."

The Court concluded with the following language, and I find it particularly appropriate in this case: "She cannot escape their effect merely because she did not intend to be bound by them or because she kept herself insulated from the significance of free and conscious acts for which she must be held responsible."

I return, therefore, to the one and only issue in this case: Did the plaintiff vote under duress in the administrative election on March 31, 1946?

I am led to the inescapable conclusion that she did not vote under duress or coercion. I have observed her on the witness stand. I have also observed the witness Cipriani, and I am fortified in this conclusion by both their testimony and their conduct on the stand.

I must note that the witness Cipriani, who had reached the voting age of 21 at the time of the March 1946 election, testified that he did not vote in that election; that he personally was never threatened by any police or gendarmes; that nothing ever did happen to him by reason of not having voted in the March 1946 election.

Judgment is awarded in favor of the defendants.